Joe CROSBY, Leverne Crosby, Rick Crosby, Plaintiffs-Appellees,

v.

Ashley PAULK, J.R. Winningham, Terry Griffin, Johnny Kendrick, Defendants-Appellants.

No. 97-8585.

United States Court of Appeals,

Eleventh Circuit.

Sept. 10, 1999.

Appeals from the United States District Court for the Middle District of Georgia. (No. 7:95-CV-88), Hugh Lawson, Judge.

Before BIRCH and BARKETT, Circuit Judges, and HANCOCK[*], Senior District Judge.

BIRCH, Circuit Judge:

This interlocutory appeal requires us to determine if local law enforcement officers and a state revenue agent are entitled to qualified immunity for investigating underage drinking and after hours sales of alcohol in nightclubs. On summary judgment, the district judge denied qualified immunity. We reverse and remand.

## I. BACKGROUND

In 1994, the Valdosta/Lowndes/Brooks Drug Task Force ("Drug Task Force") was conducting an ongoing criminal investigation of unlawful alcohol sales to minors or on Sunday of all establishments selling alcohol in Valdosta and Lowndes County. The adjoining nightclubs, known as Some Place Else and Rick's, owned by Leverne Crosby and managed by her son, Rick Crosby,[1] were known by local law enforcement

---

[*]Honorable James H. Hancock, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

[1]Some Place Else, located on Bemiss Road in Valdosta, originally was owned by Joe Crosby, husband of Leverne Crosby, until he sold it in 1988. The new owner leased and renovated the space adjoining Some Place Else and opened Studio 21, which was to be for persons 21 and older, while Some Place Else was to remain a nightclub for persons over 18. The two nightclubs were connected by a lobby or walkway area resulting in merging of the clientele with young patrons in both.

In 1990, the purchaser defaulted on his note securing the installment purchase agreement, and the Crosbys reacquired the commercial property. In the interim, Leverne Crosby, who had

officials as among the worst establishments for violating the underage drinking laws in Lowndes County. Sheriff Ashley Paulk's office and the Drug Task Force had received numerous complaints from citizens, including local clergy, a college official, and parents about serving alcohol to minors at these nightclubs. The complaints began with the opening of Some Place Else in the mid-1980's. It was well known in the community that the Crosbys' nightclubs catered to college students, ranging in age from eighteen to twenty-two.[2]

Agent Terry Griffin of the Drug Task Force began investigating alcohol sales at the Crosbys' nightclubs in February, 1994. Based on his investigation, Commander J.R. Winningham of the Drug Task Force obtained arrest warrants for Leverne Crosby, Rick Crosby, and Cindy Crosby, Rick Crosby's wife.[3] Agent Johnny Kendrick of the Georgia Department of Revenue also was investigating violations of the Georgia alcoholic beverage laws at the Crosbys' nightclubs. On March 11, 1994, Agent Kendrick and other revenue agents together with the Drug Task Force, including Agent Griffin and forty law enforcement officers, united their respective investigations for the dual purposes of conducting an administrative search of the Crosbys' nightclubs to ascertain if underage alcohol sales as well as Sunday alcohol sales were

---

opened a separate nightclub known as Rick's on Highway 84 in Lowndes County, relocated Rick's to occupy the Studio 21 space. The liquor and business licenses for Some Place Else and Rick's were in Leverne Crosby's name, and Rick Crosby managed these nightclubs owned by his mother until July 1, 1994, when Leverne Crosby sold her ownership of the two nightclubs to him.

[2]The Crosbys had drink specials on "college night" and advertised on the local college campus.

[3]Leverne and Rick Crosby were arrested pursuant to valid arrest warrants for the sale of alcoholic beverages after 12:00 A.M. on Sunday, February 27, 1994, and Sunday, March 6, 1994. The arrest warrants were obtained by Commander J.R. Winningham from a local magistrate judge. The basis for these arrest warrants consisted of the observations by Sheriff Paulk and Agent Griffin of underage alcohol sales and after hours cash and credit card, alcohol sales at the Crosbys' nightclubs as well as a confidential informant's accomplishing an after hours, credit card purchase of alcohol. Commander Winningham drafted the affidavits to support the arrest warrants. The arrest authority of the Drug Task Force originated from the Sheriff of Lowndes County, Sheriff Paulk. The district judge found that the arrest warrants were valid, and there is no issue on appeal that they were not. As a result of a change in the local ordinance concerning after hours sale of alcohol that occurred after the March 11, 1994, investigation, the charges against the Crosbys subsequently were dismissed.

occurring there and to execute the arrest warrants.[4] Local news media accompanied the investigating officers.

The nightclubs were secured so that identifications of approximately 400 patrons could be checked.[5] Verifying underage sales of alcohol requires that the minor be found under the influence of alcohol or in the possession of an alcoholic beverage. Agent Kendrick asked Joe Crosby to open his office and to produce credit card receipts so that Agent Kendrick could ascertain if there was evidence of after hours sales of alcohol; Agent Kendrick and other revenue agents also checked for credit card receipts in cash register drawers[6] and inspected beer taps to see if they were dispensing the indicated beer. There is no evidence that any officer involved in securing the nightclubs and conducting the investigation drew a weapon or threatened the arrestees or any of the patrons.[7] The investigation was completed in two hours and resulted in arrests of approximately seventy individuals and fifty-four convictions for underage drinking.

Additionally, revenue agents discovered that beer was being dispensed under incorrectly labeled taps. Subsequent investigation by revenue agents, who contacted the Crosbys' alcohol wholesalers, revealed that they were purchasing liquor for both nightclubs under one liquor license held by Leverne Crosby. This

[4]The law enforcement agents, who had to check identifications of customers, expected to encounter 500 to 700 patrons at the two nightclubs. Agent Kendrick needed the expertise and crowd-control assistance of the law enforcement officers to check the identifications of these patrons so that the inspection of business records of alcohol sales could be conducted simultaneously.

[5]The officers stopped the band music, ordered the house lights to be illuminated, told the bartenders to stop serving alcohol, ordered the patrons to remain where they were, and instructed people on the dance floor to sit on the floor and not to return to their tables.

[6]After hours or Sunday sales of alcohol could be detected from credit card receipts that had been "back timed" as to the alcohol sales. No documents showing after hours sales were found as a result of the search on March 11, 1994.

[7]In addition to the investigation into the conduct of business of establishments selling alcohol in Valdosta and Lowndes County, the Drug Task Force investigated illegal narcotics sales in Valdosta, Lowndes, and Brooks Counties. The area behind Rick's and Some Place Else was known by narcotics investigators as a favorite meeting place for persons buying and selling controlled substances. Narcotics investigators used the parking lot in front of Some Place Else and Rick's to observe suspicious activity behind these nightclubs and to monitor ingress and egress from the rear of the buildings. On the night of March 11, 1994, the Drug Task Force brought two drug dogs and, in addition to arrests for underage drinking, made some arrests for possession of illegal narcotics in the parking lot in front of the nightclubs.

3

violation of Georgia law resulted in another inspection of the nightclubs on March 17, 1994, that included Agent Kendrick and other revenue agents. The revenue agents effected an administrative confiscation of what was believed to be unlawfully purchased alcohol. They enlisted the assistance of members of the Lowndes County Sheriff's Office and the Drug Task Force to assist in removing and transporting the confiscated alcohol. Leverne Crosby was issued a citation and was ordered to appear before an Administrative Law Judge from the Department of Revenue with regard to her confiscated alcohol. At the hearing the administrative charges were reduced to a warning and the confiscated alcohol was returned to Leverne Crosby based on her agreement not to file a claim for any damaged liquor.[8]

Joe, Leverne, and Rick Crosby filed an action under 42 U.S.C. § 1983 against Sheriff Paulk, Drug Task Force Commander J.R. Winningham and Agent Griffin as well as Agent Kendrick of the Georgia Revenue Department in their individual capacities. They alleged Fourth Amendment violations consisting of unreasonable, warrantless searches and seizures, due process violations, excessive force, and related state-law claims. All defendants-appellants raised the affirmative defense of qualified immunity. After extensive discovery, defendants-appellants moved for summary judgment. The district judge granted in part and denied in part these motions for summary judgment. On appeal, defendants-appellants pursue their entitlement to summary judgment based on qualified immunity concerning the claims on which the district judge denied them qualified immunity: unreasonable, warrantless search of the premises in conjunction with executing the arrest warrants for the Crosbys; excessive force in executing the search; and related state-law claims as to Sheriff Paulk, Commander Winningham, and Agent Griffin.

## II. ANALYSIS

A.    *Qualified Immunity*

The denial of summary judgment for a qualified immunity claim is immediately appealable as a final

---

[8]After hearing the testimony at the proceeding on April 8, 1994, Agent Kendrick recalled that, in the late 1980's, the former Director of the Department of Revenue stated that the Crosbys should be allowed to purchase liquor for both establishments under one name.

decision under 28 U.S.C. § 1291. *See Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). Our review in determining entitlement to qualified immunity is *de novo. See Pickens v. Hollowell,* 59 F.3d 1203, 1205 (11th Cir.1995). Qualified immunity protects government officials who have acted within their discretionary authority from civil trials and other litigation burdens "if their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.' "[9] *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).

The qualified immunity defense "embodies an 'objective reasonableness' standard, giving a government agent the benefit of the doubt," provided that the conduct was not "so obviously illegal in the light of then-existing law that only an official who was incompetent or who knowingly was violating the law would have committed" the acts. *GJR Invs., Inc. v. County of Escambia,* 132 F.3d 1359, 1366 (11th Cir.1998). Because "we have 'rejected the inquiry into [an official's] state of mind in favor of a wholly objective standard,' " the government actor's intent and motivation are insignificant in determining qualified immunity. *Flores v. Satz,* 137 F.3d 1275, 1277 n. 4 (11th Cir.1998) (per curiam) (alteration in original) (citation omitted). "[S]tate officials can act lawfully even when motivated by a dislike or hostility" if the record shows that they would have acted in the same way without such sentiments. *Foy v. Holston,* 94 F.3d 1528, 1534 (11th Cir.1996). Thus, we need not address the alleged ill will between Sheriff Paulk and his agents and the Crosbys for qualified immunity analysis. "[W]henever a public officer is sued for money damages in his individual capacity for violating federal law, the basic qualified immunity question looms unchanged: Could a reasonable officer have believed that what the defendant did might be lawful in the circumstances and in the light of the clearly established law?" *Id.*

In reviewing an assertion of entitlement to qualified immunity, we "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all." *Conn v. Gabbert,* --- U.S. ----,

---

[9]It is evident that defendants-appellants were acting within the scope of their discretionary authority during the events in question in this case.

119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999); *see County of Sacramento v. Lewis,* 523 U.S. 833, n. 5, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998) (recognizing that deciding whether a constitutional right exists in § 1983 cases before determining if that right was clearly established at the time in question clarifies the legal standards for government officials and other individuals); *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991) (stating that courts should not assume the violation of a constitutional right but decide this preliminary issue before determining whether the law was clearly established at the time that the public official acted). Only if this threshold determination is surmounted do we "proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn,* 119 S.Ct. at 1295; *see Wascura v. Carver,* 169 F.3d 683, 685 (11th Cir.1999) (recognizing that the failure to state a violation of federal law resolves or moots the issue of qualified immunity).

For a constitutional right to be clearly established, it "must be sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). General rules, propositions, or abstractions, such as acting with probable cause, do not determine qualified immunity. *See Lassiter,* 28 F.3d at 1150. Instead, the circumstances that confronted the government actor must have been " 'materially similar' " to prior precedent to constitute clearly established law because " '*[p]ublic officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases.'* " *Id.* (citations omitted). "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances.*" *Id.* Consequently, qualified immunity is a sharply focused, situation-bound analysis. With these guiding precepts governing entitlement to qualified immunity, we examine the circumstances under which Sheriff Paulk, Commander Winningham, Agent Griffin, and Agent Kendrick acted in view of clearly established law at that time to decide if their conduct was objectively reasonable.

6

B.      *Administrative Search*

        Joe, Leverne, and Rick Crosby argue that the warrantless, two-hour search of all the patrons of their

nightclubs[10] as well as the search for documents in conjunction with execution of arrest warrants was *per se*

unreasonable under the Fourth Amendment.  While "the Fourth Amendment's prohibition on unreasonable

searches and seizures is applicable to commercial premises," the "expectation of privacy in commercial

premises ... is different from, and indeed less than, a similar expectation in an individual's home." *New York*

*v. Burger,* 482 U.S. 691, 699, 700, 107 S.Ct. 2636, 2642, 96 L.Ed.2d 601 (1987).  Although private home

searches "generally must be conducted pursuant to a warrant in order to be reasonable under the Fourth

Amendment, legislative schemes authorizing warrantless administrative searches of commercial property do

not necessarily violate the Fourth Amendment" because adequate privacy protection may be provided "by

regulatory schemes authorizing warrantless inspections." *Donovan v. Dewey,* 452 U.S. 594, 598, 599, 101

S.Ct. 2534, 2538, 69 L.Ed.2d 262 (1981) (footnote omitted).  Rather than enacting numerous statutes

permitting warrantless administrative searches, "[l]egislatures generally have confined their efforts to

authorizing administrative searches of specific categories of businesses that require regulation, and the

resulting statutes usually have been held to be constitutional." *Illinois v. Krull,* 480 U.S. 340, 351, 107 S.Ct.

1160, 1168, 94 L.Ed.2d 364 (1987) (citing representative cases of regulated industries).

        Consequently, the privacy "expectation is particularly attenuated in commercial property employed

in 'closely regulated' industries," that have no reasonable expectation of privacy over their products, which

---

[10]The Crosbys argue that the law enforcement officers' checking their patrons' identifications during the May 11, 1994, investigation constituted an unreasonable search or seizure violative of the Fourth Amendment.  Freedom from unreasonable searches and seizures, however, is a personal right which cannot be asserted vicariously.  *See Rakas v. Illinois,* 439 U.S. 128, 133-34, 99 S.Ct. 421, 425-26, 58 L.Ed.2d 387 (1978).  None of the patrons of the Crosbys' nightclubs has ever been a party in this case.  The Crosbys cannot assert Fourth Amendment rights of third parties who were subject to searches because they were on the premises of their nightclubs when the administrative search occurred.  *See San Jacinto Sav. & Loan v. Kacal,* 928 F.2d 697, 704 (5th Cir.1991) (per curiam) (determining that owner of arcade and soda fountain business could not assert the Fourth Amendment rights of third parties subjected to searches or seizures while on the business premises).  Therefore, in addition to our conclusion that the May 11, 1994, investigation was a legitimate administrative search, the Crosbys cannot assert Fourth Amendment claims based on governmental intrusions on the rights of others than themselves.

7

historically have been the subject of government oversight. *Burger,* 482 U.S. at 700, 107 S.Ct. at 2642. "[T]he liquor industry long [has been] subject to close supervision and inspection," *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 77, 90 S.Ct. 774, 777, 25 L.Ed.2d 60 (1970); this strict regulation, which began in England and was adopted by the American Colonies, preceded the enactment of the Fourth Amendment, *see id.* at 75, 90 S.Ct. at 776. Because of the reduced expectation of privacy in a closely regulated industry, the traditional warrant and probable cause prerequisites for a reasonable government search under the Fourth Amendment have less application to the owner or operator of such a commercial premises. *See Burger,* 482 U.S. at 702, 107 S.Ct. at 2643. Therefore, "where the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened, *a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment.*" *Id.,* 107 S.Ct. at 2643-44 (emphasis added). Consequently, an administrative inspection of a closely regulated business is a "well-established exception to the warrant requirement" for a search. *Id.* at 712, 107 S.Ct. at 2649.

A warrantless inspection of a pervasively regulated business can be reasonable, however, only if three criteria are met. *See id.* at 702, 107 S.Ct. at 2644. "First, there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made." *Id.* "Second, the warrantless inspections must be 'necessary to further [the] regulatory scheme.' " *Id.* (alteration in original) (citation omitted). Third, " 'the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.' " *Id.* at 703, 107 S.Ct. at 2644 (alteration in original) (citation omitted). Thus, as a substitute for a warrant and fulfilling that purpose, the regulatory statute must advise the owner of a commercial premises that the search is pursuant to the law and define the scope and the discretion of the inspecting officials. *See id.* Specifically, the statute must put the owner of the commercial premises on notice as to time, place, and scope when the commercial property will be subject to periodic inspections for a delineated purpose. *See id.*

8

In this case, prevention of underage alcohol sales as well as alcohol sales on Sunday obviously are substantial government interests. Evidence of underage sales of alcohol requires that minors be "caught in the act" of being under the influence or in the possession of an alcoholic beverage. If the minor disposes of the alcoholic drink, "sleeps off," or eliminates its effects, then the evidence of alcohol consumption is lost. Requiring inspectors or other law enforcement agents to obtain warrants before conducting an investigation might alert nightclub and bar owners to the impending inspection, which would defeat the purpose of the inspection to investigate for violations of the Georgia Department of Revenue statutes relating to alcohol. *See Donovan,* 452 U.S. at 603, 101 S.Ct. at 2540 (requiring mine inspectors to obtain warrants might alert mine owners). Therefore, unannounced or surprise inspections are "crucial if the regulatory scheme aimed at remedying this major social problem is to function at all." *Burger,* 482 U.S. at 710, 107 S.Ct. at 2648; *see Krull,* 480 U.S. at 357, 107 S.Ct. at 1171 (recognizing that inspections "may be a necessary component of regulation in certain industries" and acknowledging that "unannounced, warrantless inspections may be necessary 'if the law is to be properly enforced and inspection made effective' " (citation omitted)). As a result of the March 11, 1994, investigation, which involved checking the identifications of approximately 400 patrons to determine if minors were purchasing alcohol, there were approximately seventy arrests and fifty-four convictions for underage possession of alcohol. Manifestly, these arrests and convictions would not have occurred if there had been prior knowledge of the inspection of the Crosbys' nightclubs.

Significantly, the Georgia statute giving the Commissioner of Revenue the authority to make such inspections gives notice to owners of commercial properties where alcohol is sold of the time, place, and scope of inspections required to enforce the Georgia Alcoholic Beverage Code:

> The *commissioner and his agents may enter upon the licensed premises* of any person engaged in the manufacture, transportation, distribution, sale, storage, or possession of alcoholic beverages *at any time for the purpose of inspecting the premises* and enforcing this title and *shall have access during the inspection to all books, records, and supplies relating to* the manufacture, transportation, *distribution, sale, storage, or possession of alcoholic beverages.*

O.C.G.A. § 3-2-32 (emphasis added). The Georgia Alcoholic Beverage Code further provides:

9

(a) *Upon a request by the governing authority of any municipality or county, the sheriff or chief of a county police force,* the judge of the superior court of any county, or the Governor, *the commissioner,* in unusual circumstances, *may* and, in the case of an order from the Governor, shall *direct special agents and enforcement officers of the department to render assistance in:*

1) Any criminal case;

2) The prevention of violations of law;  or

3) *Detecting and apprehending those violating any criminal laws of this state,* any other state, or the United States.

(b) This Code section shall not apply solely to agents who enforce this title but shall apply to all agents of the department with law enforcement powers.

O.C.G.A. § 3-2-31 (emphasis added).  Thus, agents of the Georgia Department of Revenue also are statutorily authorized to assist other law enforcement authorities in enforcing Georgia laws, including the Georgia Alcoholic Beverage Code, which the Georgia Department of Revenue specifically enforces.  *See id.*

Therefore, Agent Kendrick of the Georgia Revenue Department was statutorily authorized to enter the Crosbys' nightclubs to ascertain if there were underage sales of alcoholic beverages, check the taps, and inspect credit card receipts to determine if there had been after-hours alcohol sales.  Agent Kendrick and local law enforcement agents also were statutorily authorized to assist each other in conducting such an inspection to enforce the Georgia Alcoholic Beverage Code. Additional assistance for the Georgia Revenue Department was necessary given the large area encompassed by the Crosbys' nightclubs and because the identifications of approximately 400 patrons had to be checked.  Furthermore, law enforcement aid was required to secure the premises so that patrons would not leave while identifications were being checked for underage consumers of alcohol.  The Supreme Court "fail[ed] to see any constitutional significance in the fact that police officers, rather than 'administrative' agents, are permitted to conduct the [statutory] inspection." *Burger,* 482 U.S. at 717, 107 S.Ct. at 2651.  Therefore, the law enforcement officers' checking the patrons identifications, while Agent Kendrick and other revenue agents checked for records for after hours sales of alcohol, is constitutionally insignificant.

The Crosbys argue that Agent Kendrick and the law enforcement officers had planned in advance

10

the inspection that occurred on March 11, 1994, which evidences that they should have advised the Crosbys of the inspection and that there was sufficient time to obtain a warrant for the search. The Crosbys, however, misapprehend the necessity of unannounced inspections in administrative searches of closely regulated businesses as an exception to the warrant requirement. As we have explained, specific notice of the inspection would have frustrated the purpose of the administrative search because the Crosbys would have been alerted to prevent underage sales of alcohol or to secrete evidence of after hours sales. Under O.C.G.A. § 3-2-32, the Crosbys were on general notice that such an inspection could occur "at any time." *Id.*

It is not our role to tell local governments how to conduct an administrative search to enforce the Georgia Alcoholic Beverage Code as to underage and Sunday alcohol sales.[11] We conclude on the facts of this case that the statutorily authorized investigation conducted by Agent Kendrick and forty local law enforcement officers, who checked the identifications of approximately 400 patrons, many of whom were underage college students consuming alcoholic beverages, was not unreasonable. Furthermore, the magnitude of the administrative search required planning for an organized and orderly inspection of the patrons' identifications by the officers as well as looking for documents evidencing Sunday alcohol sales. There is no constitutional offense in various law enforcement agents coordinating and consolidating their efforts to enforce a state statute authorizing such cooperation to conduct an administrative search for violations of the Georgia Alcoholic Beverage Code in conjunction with executing arrest warrants for previously observed

---

[11]For example, the Crosbys have suggested that the patrons who were not underage should have been allowed to leave rather than waiting for two hours while the identifications of the other patrons were checked. It is unclear whether the Crosbys propose a preliminary screening of the patrons to determine those of legal drinking age and letting them leave together or allowing patrons to leave as this determination was made. The first option could have protracted the identification checking process when as many as 700 patrons were expected, and either option could have presented the opportunity for underage patrons to intermingle with departing patrons of legal drinking age and, thereby, escape detection. In any event, the method that the law enforcement officers deemed best at the time for conducting the checking of approximately 400 patrons' identifications was not unreasonable or unconstitutional for the purpose of qualified immunity analysis. *See Lassiter,* 28 F.3d at 1150 (recognizing that judicial determination of qualified immunity is not based on hindsight).

11

violations of these laws.[12]

In this case, Agent Kendrick and the law enforcement officers who conducted the investigation of the Crosbys' nightclubs on March 11, 1994, and March 17, 1994,[13] were acting under a valid statute permitting a warrantless, administrative search to investigate for violations of the Georgia laws relating to alcohol sales. In addition to executing the valid arrest warrants on the Crosbys, the law enforcement agents assisted Agent Kendrick in checking the identifications of the patrons for underage sales of alcohol, as the Georgia statute authorizes. This was reasonable enforcement of the statute and, particularly, for checking the identifications of approximately 400 patrons. Furthermore, the search on March 11, 1994, is not rendered unreasonable because the law enforcement officers had authority to arrest individuals for crimes other than violations of the Georgia Alcoholic Beverage Code, such as sales of controlled substances, in addition to assisting with the statutorily authorized, administrative search of the premises.[14] *See Burger,* 482 U.S. at 716,

---

[12]As we have stated, there were two purposes for the operation that occurred on March 11, 1994. First, to execute the arrest warrants for the Crosbys previously observed alcohol sales to minors and on Sundays. Therefore, the *reason* that the arrest warrants were issued was for violations of Georgia Alcoholic Beverage Code relating to underage and Sunday sales of alcohol, which Agent Kendrick's office, the Georgia Revenue Department, enforces.

> Second, the law enforcement officers assisted Agent Kendrick in conducting an administrative search of the Crosbys' nightclubs to ascertain if there had been violations of the Georgia Alcoholic Beverage Code. Not only do lesser-staffed law enforcement agencies, like the Georgia Revenue Department, occasionally require the assistance of other law enforcement agencies with more personnel, but also accomplishing two law enforcement procedures at the same time is efficient rather than having two separate operations. The consolidation of these law enforcement efforts was reasonable and not constitutionally offensive under the applicable law governing each.

[13]The same legal analysis used for the March 11, 1994, investigation applies to the March 17, 1994, alcohol inspection and confiscation as well as any subsequent inspections by Agent Kendrick and law enforcement officers, who acted pursuant to authorizing statutes of the Georgia Alcoholic Beverage Code. *See, e.g.,* O.C.G.A. § 3-2-33(3) (permitting any peace officer or authorized agent of the Commissioner of Revenue to declare as contraband any alcoholic beverage "[s]old, conveyed, or possessed, concealed, stored, or held for sale by any person who has not first obtained all licenses required by this title"); O.C.G.A. § 3-2-35(a) (requiring the Commissioner of the Department of Revenue and his agents to "seize and take possession of any contraband found in the possession of any person in violation of this title").

[14]The district judge agreed with the Crosbys that *Swint v. City of Wadley,* 51 F.3d 988 (11th Cir.1995), was dispositive of the law enforcement defendants' qualified immunity defense. *Swint,* however, is

717, 107 S.Ct. at 2652. The test for qualified immunity is "whether a reasonably well-trained officer would

distinguishable factually and legally. This case concerns investigation into the sale of a *legal product,* alcohol, which law enforcement agents had witnessed being sold in an unlawful manner by the *owners or employees* of the Crosbys' nightclubs to underage patrons and on Sunday, while *Swint* involved two raids by law enforcement officers on a nightclub in Wadley, Alabama, in response to complaints of *illegal drug sales* occurring there by *patrons.* In both of the raids in *Swint,* an undercover officer went into the nightclub, and a patron offered to sell him drugs. The raids ensued and included 30 to 40 law enforcement officers with SWAT team officers, all of whom aimed their weapons at nightclub owners and employees as well as patrons. Although only two people were arrested in the two *Swint* raids, patrons were prohibited from moving or leaving until the officers searched the cash register and door receipts, and confiscated some currency from the door receipts.

In addition to the factual differences in this case and *Swint,* the legal analyses are distinct: arguable probable cause and statutory administrative search. In *Swint,* our court determined that the law enforcement officers did not have arguable probable cause for the warrantless search of the patrons and employees of the nightclub as well as search of the cash register and door receipts and detention for an hour and a half at gunpoint of patrons and nightclub employees who were not involved in the drug sales while these searches occurred. *See id.* at 996-97. In determining that no reasonable officer could have believed that probable cause existed to search the entire nightclub, the *Swint* court also concluded that no reasonable officer could have believed that the two raids were legitimate, warrantless administrative searches. *See id.* at 998-99. Our court distinguished between an administrative search pursuant to a statute that informs the owner of a commercial premises of the scope and frequency of an administrative inspection and the two *Swint* raids, where, in contrast to this case in which the *primary purpose of the administrative search was to detect violations of the Georgia Alcoholic Beverage Code,* "instead, a number of people were searched for evidence of their violation of drug laws, searches to which they did not consent as part of any regulatory scheme." *Id.* at 999. Furthermore, the law enforcement officers in this case had valid arrest warrants for the Crosbys, which have not been questioned, and they assisted Agent Kendrick in a statutorily authorized administrative search of the patrons for underage drinking and Sunday sales of alcohol. *Significantly, both the arrests and the investigation of patrons' identifications were related to violations of the Georgia Alcoholic Beverage Code.* Without displaying their weapons, the officers checked the identifications of approximately 400 patrons, made approximately 70 arrests of underage patrons for consuming alcohol, which resulted in 54 convictions.

Finally, *Swint* originally was decided in 1993, modified by our court in 1994, and vacated by the Supreme Court in 1995 because our court did not have pendent appellate jurisdiction. *See Swint v. City of Wadley,* 5 F.3d 1435 (11th Cir.1993), *modified* 11 F.3d 1030 (11th Cir.1994), *vacated,* 514 U.S. 35, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995). The 1995 opinion by our court addressed herein was in response to the remand by the Supreme Court and that substituted opinion maintained the original analysis of the Fourth Amendment issues. The factual and legal distinctions that we have explained are sufficient to preclude *Swint* from being clearly established law for a reasonable law enforcement officer in 1994 because the cases are not " 'materially similar' " such that *Swint* could provide guidance for the conduct of the officers in this case. *Lassiter,* 28 F.3d at 1150 (citation omitted). Additionally, the subsequent history of *Swint* would prevent it from being clearly established law for the officers in this case because they need not have been creative or imaginative in analogizing from a case that could not set a bright-line standard because it was not final. *See id.*

13

have known that the search was illegal" irrespective of subjective considerations. *Malley v. Briggs,* 475 U.S. 335, 345, 106 S.Ct. 1092, 1098, 89 L.Ed.2d 271 (1986). On the facts of this case, Agent Kendrick, Sheriff Paulk, Commander Winningham, and Agent Griffin are entitled to qualified immunity because their searches of the Crosbys' nightclubs were not violative of clearly established law governing warrantless administrative searches that a reasonable government official would have known in 1994.[15]

C.      *Excessive Force*

The Crosbys assert a separate claim for excessive force based on the *number* of law enforcement officers used to conduct the searches at the Crosbys' nightclubs on March 11, 1994. They do not contend that the officers drew their weapons or physically touched the patrons. In assisting Agent Kendrick in his administrative search, forty officers secured the commercial premises until the identifications of approximately 400 patrons could be checked to ascertain whether underage consumers of alcohol were present. Having a sufficient number of law enforcement officers to conduct checking the identifications of an expected 500 to 700 patrons was an integral part of the administrative search instead of being a discrete search related to the execution of the search warrants that the officers undertook on their own.

Rather than being based solely on the number of officers present, excessive force claims under the Fourth Amendment refer to unreasonable force or physical contact exerted by law enforcement agents in the

---

[15]The Crosbys' attempt to assert a cause of action against the law enforcement officials for the presence of the accompanying media is unavailing. Although the Supreme Court has held that law enforcement agents violate the Fourth Amendment by bringing media into a home during the execution of an arrest warrant when the media do not assist with the execution of the warrant, the Court also held that the law enforcement officials were entitled to the qualified immunity defense because the law was not clearly established at the relevant time so that a reasonable officer would have believed that bringing media observers to witness the execution of the arrest warrant was unlawful. *See Wilson v. Layne,* --- U.S. ----, 119 S.Ct. 1692, 1699, 1700-01, 143 L.Ed.2d 818 (1999). Similarly, the law was not clearly established in 1994, when the inspections at issue in this case occurred. *See Lassiter,* 28 F.3d at 1150 ("Because qualified immunity is a doctrine of practical application to real-life situations, courts judge the acts of defendant government officials against the law and facts at the time defendants acted, not by hindsight, based on later events."). "Given such an undeveloped state of the law, the officers in this case cannot have been 'expected to predict the future course of constitutional law.' " *Wilson,* 119 S.Ct. at 1701 (quoting *Procunier v. Navarette,* 434 U.S. 555, 562, 98 S.Ct. 855, 860, 55 L.Ed.2d 24 (1978)). Therefore, the law enforcement officials are entitled to qualified immunity regarding the presence of the media in this case.

context of arrests, investigatory stops, and seizures of people. *See Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989); *see also California v. Hodari D.,* 499 U.S. 621, 626, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991) (recognizing that "[a]n arrest requires *either* physical force ... *or,* where that is absent, *submission* to the assertion of authority"); *I.N.S. v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984) (explaining that a person has been seized " 'if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave' " (citation omitted)). The proper standard for evaluating such a Fourth Amendment, excessive force claim is whether, under the circumstances confronting the officers and disregarding their intent or motivation, their conduct was objectively reasonable. *See Graham,* 490 U.S. at 397, 109 S.Ct. at 1872; *Cottrell v. Caldwell,* 85 F.3d 1480, 1492 (11th Cir.1996). In making this objective assessment, a court may consider in addition to physical injury "[o]ther relevant factors includ[ing] the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Sharrar v. Felsing,* 128 F.3d 810, 822 (3d Cir.1997) (affirming summary judgment for police officers, who, in response to a domestic assault, took twenty officers, including a SWAT team dressed in black fatigues and armed with shotguns, rifles, and machine guns, as well as drug/explosives dogs to execute four arrest warrants at a private residence in a quiet, seaside town on individuals whom they required to lie face down in the dirt with guns to their heads while subjecting them to vulgar threats, because, under a totality of circumstances, the officers' conduct was not unconstitutional excessive force). Thus, the objective reasonableness analysis of excessive force claims not only balances the nature and quality of the intrusion on an individual's Fourth Amendment rights with the importance of the justifying government interests but also assesses the use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" under the totality of circumstances, disregarding intent. *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872; *Ortega v. Schramm,* 922

15

F.2d 684, 694-95 (11th Cir.1991) (per curiam).

Despite the similarities of the objective reasonableness standard used in both excessive force and qualified immunity analysis, the Crosbys' attempt to assert an excessive force claim fails for two reasons. First, as we have explained, although numerous law enforcement officers checked the identifications of approximately 400 patrons, Fourth Amendment claims are personal, and no patron who was detained for the identification inspection has asserted a claim of excessive force as a party to this action. Second, the inspection of patrons' identifications occurred in the context of a *valid, warrantless administrative search* rather than in the process of the execution of arrest warrants, stops, or seizures. Although the Crosbys contend that their businesses were disrupted while the officers checked the patrons' identifications, they "were put on notice that their businesses would be subject to inspections pursuant to the state administrative scheme," *Krull,* 480 U.S. at 359, 107 S.Ct. at 1172, "at any time," O.C.G.A. § 3-2-32, by the Georgia statute authorizing warrantless searches of purveyors of alcohol. "Unless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law." *Krull,* 480 U.S. at 349-50, 107 S.Ct. at 1167. Furthermore, the Supreme Court has explained that, even though "a statute authorizing warrantless administrative searches affects an entire industry and a large number of citizens," it is constitutional to implement legislative oversight of a pervasively regulated industry. *Id.* at 353, 107 S.Ct. at 1169. The Crosbys have incorrectly characterized their claim based on the number of officers that conducted the search as excessive force. Because forty law enforcement officers who provided the official personnel to check the identifications of approximately 400 patrons, when as many as 700 patrons were expected, were the reasonable *means* to assist Agent Kendrick in conducting the statutorily authorized *administrative search,* the Crosbys have failed to state the violation of a constitutional right *in this context. See Conn,* 119 S.Ct. at 1295.

D.    *State-Law Claims*

The Crosbys' state-law claims that survived the district judge's summary judgment order are tortious

interference with business relations as to Sheriff Paulk, Commander Winningham, and Agent Griffin as well as slander as to Sheriff Paulk. Supplemental jurisdiction permits parties to append state claims in federal cases, provided that the state-law claims "form part of the same case or controversy" as the federal claims. 28 U.S.C. § 1367(a); *see Shanaghan v. Cahill,* 58 F.3d 106, 109 (4th Cir.1995) (recognizing that 28 U.S.C. § 1367 codified the doctrine of pendent jurisdiction derived from *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)). A district court has discretion to dismiss state-law claims when "all claims over which it has original jurisdiction" have been dismissed. 28 U.S.C. § 1367(c)(3). Because this interlocutory appeal accords qualified immunity to Sheriff Paulk, Commander Winningham, and Agent Griffin, no federal claims remain.

On remand, the district judge must decide whether continued exercise of supplemental jurisdiction for the state claims is appropriate. *See L.S.T., Inc. v. Crow,* 49 F.3d 679, 685 (11th Cir.1995) (per curiam). In making that determination, the judge should "take into account concerns of comity, judicial economy, convenience, fairness, and the like." *Roche v. John Hancock Mut. Life Ins. Co.,* 81 F.3d 249, 257 (1st Cir.1996). If he decides to dismiss these state-law claims, then they should be dismissed without prejudice so that the claims may be refiled in the appropriate state court. *See Bass v. Parkwood Hosp.,* 180 F.3d 234, 246 (5th Cir.1999).

## III. CONCLUSION

In this appeal, Sheriff Paulk, Commander Winningham, Agent Griffin, and Agent Kendrick argue that they are entitled to qualified immunity regarding the Crosbys' claims relating to the administrative search and excessive force. As we have explained, we agree. Therefore, we REVERSE the district judge's summary judgment order as to denying qualified immunity to these defendants-appellants and REMAND for the district judge to grant them summary judgment based on qualified immunity and to determine whether the remaining state-law claims relating to Sheriff Paulk, Commander Winningham, and Agent Griffin should be dismissed without prejudice.