UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 07-1037

DAVID M. RUTTENBERG; JUDITH G. RUTTENBERG; TRIPLE D
ENTERPRISES, INC.,

Plaintiffs - Appellants,

v.

FRANK JONES, Mayor of Manassas Park, Virginia, in his official
and individual capacities; JOHN EVANS, Chief of Police of
Manassas Park, Virginia, in his official and individual
capacities; DETECTIVE L, Manassas Park Police Detective, in
his official and individual capacities; CITY OF MANASSAS PARK,
VIRGINIA; DETECTIVE W, Prince William County Police Detective,
in his official and individual capacities; THOMAS L. KIFER, in
his official and individual capacities,

Defendants - Appellees.

----------------------------------------

AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA, INCORPORATED,

Amicus Supporting Appellants.

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria.  T. S. Ellis, III, Senior
District Judge.  (1:06-cv-00639-TSE-BR)

Argued: March 19, 2008            Decided: June 17, 2008

Before WILLIAMS, Chief Judge, WILKINSON, Circuit Judge, and Irene
M. KEELEY, United States District Judge for the Northern District
of West Virginia, sitting by designation.

Affirmed in part, reversed in part, and remanded by unpublished per curiam opinion.

**ARGUED:** Judith Lynne Wheat, WHEAT & WU, Washington, D.C., for Appellants.  John David Wilburn, MCGUIREWOODS, L.L.P., McLean, Virginia, for Appellees.  **ON BRIEF:** Neil H. Ruttenberg, Beltsville, Maryland, for Appellants.  Anand V. Ramana, MCGUIREWOODS, L.L.P., McLean, Virginia, for Appellees Frank Jones, John Evans, Detective L, City of Manassas Park, Virginia; M. Alice Rowan, PRINCE WILLIAM COUNTY, Prince William, Virginia, for Appellee Detective W. Rebecca K. Glenberg, AMERICAN CIVIL LIBERTIES UNION OF VIRGINIA FOUNDATION, INC., Richmond, Virginia, for Amicus Supporting Appellants.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

David Ruttenberg, Judith Ruttenberg, and Triple D Enterprises, Inc. (collectively "Appellants") appeal the dismissal of their complaint, which alleged that numerous officials of the City of Manassas Park and Prince William County and the City of Manassas Park itself (collectively "Appellees") violated their rights under the First, Fourth, and Fourteenth Amendments during an alleged multi-year course of conduct designed to harm Appellants and destroy their business by, among other things, manufacturing evidence of illegal drug transactions, conducting an illegal search of the business, and committing perjury during state administrative proceedings. The district court dismissed Appellants' First and Fourteenth Amendment claims for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and dismissed Appellants' Fourth Amendment claim because it concluded that Appellees were entitled to qualified immunity for their actions. We affirm the dismissal of Appellants' First and Fourteenth Amendment claims, but reverse the district court's dismissal of the Fourth Amendment claim and remand for further proceedings consistent with this decision.

I.

The district court granted Appellees' motion to dismiss, so we accept as true the well-pleaded allegations stated in the complaint

3

and view the complaint in the light most favorable to Appellants. Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). These facts can be summarized as follows:

David Ruttenberg and his mother Judith Ruttenberg, both citizens of Maryland, own and operate Triple D Enterprises, Inc. ("Triple D"), a Maryland corporation with its principal place of business in Virginia. In 1992, Triple D opened the Rack 'N' Roll Billiard Club ("RNR") in Manassas Park Shopping Center, located in the independent city of Manassas Park, Virginia. In 1993, RNR applied for, and was granted, a Virginia Alcoholic Beverage Control ("ABC") license for beer. RNR also possessed a conditional-use permit from the City of Manassas Park allowing the operation of the business on the premises. Until 2004, RNR received no citations for ABC violations although it was subject to ABC's undercover monitoring program. From 1993 to 2004, the business was generally very successful and well-known in the community, so much so that the Vice-Mayor of Manassas Park actually served as a disc jockey at the club for four years.

In the fall of 2001, Detective L, a police officer with the City of Manassas Park Police Department, began dating Nina Buell, a friend of David Ruttenberg (hereinafter "Ruttenberg"). Detective L "did not like David Ruttenberg's friendship with Buell." (J.A. at 65.) Tina McKnight, a RNR waitress, informed Ruttenberg that Buell had told her of a conversation with Detective L in which he

4

informed Buell that Ruttenberg was under investigation for cocaine use and distribution. Ruttenberg called Detective L to discuss the allegation, and Detective L responded by contacting McKnight and berating her until she retracted her previous statement. Detective L then told Ruttenberg that he would "take down" Ruttenberg and RNR if he heard anything more about the issue. (J.A. at 66.)

In response, Ruttenberg called Detective L's superior, Officer Larry Berry, and informed him of the threat and Ruttenberg's belief that "[Detective L] seemed intent on destroying [him] and RNR" by alleging that he was "under some kind of criminal investigation for drug distribution." (J.A. at 66.) Officer Berry then cancelled a "ride-along" that Detective L had arranged for himself and Buell. (J.A. at 67.)

Thereafter, in late 2001, Detective L initiated a plan to retaliate against Ruttenberg. According to Appellants, the plan began in December 2001, when Detective L initiated "bogus charges" against Ruttenberg. (J.A. at 68.) Ruttenberg had previously reported that an employee had stolen equipment from RNR, but when he learned that the employee faced significant jail time due to prior convictions, Ruttenberg, in an act of mercy, decided not to pursue the complaint. Following that decision, Ruttenberg was charged with filing a false police report; on his court date, the charges were dismissed even though Ruttenberg saw Detective L in the courtroom that day.

After this incident, Ruttenberg and his father Neil Ruttenberg, who is an attorney, met with John Evans, the Manassas Park Police Chief, to discuss Detective L's conduct. Chief Evans, however, took no action against Detective L.

By the spring of 2003, Detective L had become a member of the Narcotics Task Force, a joint effort among the Prince William County, the City of Manassas, and the City of Manassas Park Police Departments to curb drug use and distribution. Around this time, a female friend of Ruttenberg was arrested for driving while intoxicated. Detective L met with her and offered to dismiss the charges if she would help facilitate drug transactions on the premises of the RNR. Subsequently, she informed Ruttenberg of the Narcotics Task Force's offer, and she later told Ruttenberg that the Task Force was planning a raid at RNR to apprehend the perpetrators of drug transactions conducted at RNR and to search RNR. Upon hearing this information, Ruttenberg immediately contacted Chief Evans to complain about Detective L's actions. No raid occurred at that time, but the charges against Ruttenberg's female friend were reinstated.

Thereafter, in late 2003 or early 2004, Detective L became the case agent for a Narcotics Task Force investigation into Ruttenberg's alleged cocaine use and distribution at RNR. At that time, Detective L came into contact with Thomas L. Kifer, a convicted felon who was in jail for passing bad checks at RNR.

Prior to his time in prison, Kifer had worked for RNR performing various odd jobs, including door security. Detective L asked Kifer to become a paid police informant and to aid in the investigation of Ruttenberg. Kifer, who blamed Ruttenberg for his jail stint, agreed and later told a subsequent employer that he was part of a plot to destroy Ruttenberg.

In January 2004, after his release from jail, Kifer approached Ruttenberg about providing door security at RNR. Although initially hesitant to rehire Kifer, Ruttenberg eventually relented. Ruttenberg clearly communicated to Kifer and his other employees that RNR's policy was that drug dealers were not to be tolerated on the premises and that known drug dealers were to be removed from the premises immediately.

In February 2004, Detective L assigned Detective W, a detective with the Prince William County Police Department and a member of the Narcotics Task Force, to help investigate Ruttenberg and RNR. Detective L told Detective W that RNR was an "open air drug market," (J.A. at 73), although there was no evidence supporting such an assertion.

During this time period, Ruttenberg was paying Jeffrey Price, a homeless individual, to perform custodial and cleaning services at RNR after hours. Ruttenberg became aware that Price had an arrest record and became suspicious that Price was dealing drugs at

RNR. He confronted Price, who stated he was working with the police but was not engaged in illegal activity at RNR.

Nonetheless, between February 25, 2004 and April 19, 2004, Detective W purchased drugs on eight occasions at RNR, and on seven of those occasions he bought the drugs from Price. Detective W was the only purchaser in any of the illegal drug transactions at RNR, and Kifer was aware of these transactions but, because of his status as a police informant working with Detective L and Detective W, he continually permitted Price and other drug dealers with whom he was acquainted onto the premises at RNR. Kifer apparently received payments from several drug dealers in exchange for allowing them to enter the premises. Neither Ruttenberg himself, nor any employees of RNR other than Kifer, were involved in these drug transactions.

Despite these transactions involving Detective W, Detective L was unable to procure a search warrant for RNR. Undeterred, Detective L and the Narcotics Task Force contacted Special Agent Loftis of the Virginia ABC authorities to request the participation of ABC authorities in conducting an administrative search at the RNR. Because it held an ABC license, RNR was subject to administrative searches by ABC Special Agents. See 3 Va. Admin. Code § 5-50-70(B) (2007). Special Agent Loftis agreed and, on June 2, 2004, the Narcotics Task Force raided RNR with over fifty police and law enforcement personnel. Only six or seven of the law

8

enforcement personnel were ABC agents and many of the participants were "heavily armed SWAT team members, in full tactical gear." (J.A. at 76.) During the raid, which lasted between one and two hours, the heavily-armed law enforcement personnel detained and searched RNR patrons and employees. Additionally, the officers searched Ruttenberg's private office, in which they found two bottles of vodka.

The team of officers discovered only one ABC violation as part of the raid: Ruttenberg kept two bottles of un-chilled Mexican beer that should have been labeled as "samples," but were not. (J.A. at 78.) According to the complaint, only Jeffrey Price, one of the participants in the drug transactions orchestrated by Detective W, was arrested.

Following the raid, Ruttenberg, accompanied by a friend who was a police officer on sabbatical from the Prince William County Police Department, went to the Northern Virginia Electrical Cooperative ("NOVEC") to pay RNR's electric bill. Upon arriving in the NOVEC parking lot, two Prince William County police cruisers blocked Ruttenberg's car. The officers, who were members of the Narcotics Task Force, exited the police vehicles with their weapons drawn and pointed at Ruttenberg and his friend. Once Ruttenberg's friend identified himself, the officers immediately withdrew.

In the weeks following the raid, Frank Jones, the Mayor of Manassas Park, and Chief Evans began patrolling the area around RNR to obtain information about alleged illegal activity occurring at

RNR.  Appellants claim that Ruttenberg and others observed Mayor Jones outside RNR at odd hours of the night, including past midnight on numerous occasions.

As a result of the raid, the ABC Board identified four violations at RNR: (1) disorderly conduct (based on information provided by Detective W that female patrons exposed their breasts on three occasions in a four-month period); (2) serving as a meeting place or rendezvous for users of narcotics/drunks/etc.; (3) keeping or allowing to be kept unauthorized alcoholic beverages (the samples of Mexican beer) on the premises; and (4) consumption of alcoholic beverages by a person less than twenty-one years of age.  Based on these violations, in late 2005, the ABC Board held an evidentiary hearing and revoked Triple D's ABC license. Appellants allege that Detective L and Kifer perjured themselves during this hearing, and that the deprivation of the ABC license arose from the "deliberate, conscience shocking campaign" of the defendants.  (J.A. at 82.)  Prior to these citations, Triple D had a perfectly clean record.  And, to this date, Ruttenberg has not been arrested or charged with any drug-related offenses.

In 2006, the Manassas Park City Council voted to deny Triple D's request to renew its conditional-use permit and ordered Triple D to vacate the premises on which RNR was located.  Both decisions remain on appeal in the Virginia state court system.

Based upon these events, on June 1, 2006, Appellants filed an eight count complaint in the United States District Court for the

Eastern District of Virginia against Mayor Jones, Chief Evans, Detective L, Detective W, the City of Manassas Park, and Thomas Kifer alleging (1) that all the defendants violated Ruttenberg's Due Process rights under the Fourteenth Amendment by depriving Ruttenberg of his ABC license, conditional-use permit, and right to conduct his business (Count I);[1] (2) that Chief Evans, Detective L, Detective W, Kifer, and the City of Manassas Park retaliated against Ruttenberg for exercising his right to freedom of speech under the First Amendment (Count II); (3) that Chief Evans, Detective L, Detective W, Kifer, and the City of Manassas Park engaged in an unreasonable search and seizure in violation of the Fourth Amendment (Count III); (4) that Mayor Jones, Chief Evans, Detective L, Detective W, and the City of Manassas Park selectively prosecuted Ruttenberg in violation of the Fourteenth Amendment's Equal Protection Clause (Count IV); (5) that Mayor Jones, Chief Evans, Detective L, Detective W, and Kifer entered a conspiracy to violate Ruttenberg's civil and constitutional rights (Count V); (6) that Mayor Jones, Chief Evans, Detective L, Detective W, and Kifer

---

[1]Appellees argue that we should affirm the dismissal of Count I because the Rooker-Feldman doctrine deprives us of jurisdiction to hear issues related to the ABC and the conditional-use permit proceedings. But as Appellee Prince William County conceded before the district court, the Rooker-Feldman doctrine is inapposite because "the Rooker-Feldman doctrine applies only when the loser in state court files suit in federal district court seeking redress for an injury allegedly caused by the state court's decision itself." (J.A. at 14 (quoting Davani v. Virginia Dep't of Transp., 434 F.3d 712, 713 (4th Cir. 2006)). Here, there is not yet a final state court decision, and Appellants seek redress for injuries allegedly caused by Appellees' actions, not a state court decision.

11

tortuously interfered with Ruttenberg's contracts (Count VI); (7) that Mayor Jones, Chief Evans, Detective L, Detective W, and Kifer committed common law civil conspiracy against Ruttenberg (Count VII); and (8) that Mayor Jones, Chief Evans, Detective L, Detective W, and Kifer engaged in a business conspiracy against Ruttenberg in violation of Va. Code Ann. §§ 18.2-499, 18.2-500 (2004 & Supp. 2007) (Count VIII).

On July 7, 2006, the defendants, under Federal Rule of Civil Procedure 12(b)(6), moved to dismiss Appellants' complaint for failure to state a claim. The district court, by published opinion, Ruttenberg v. Jones, 464 F.Supp. 2d 536 (E.D. Va. 2006), granted the motion to dismiss on December 13, 2006, concluding that Counts I, II, IV, and V failed to state a claim upon which relief could be granted and that the defendants were entitled to qualified immunity as to Count III (the Fourth Amendment claim). The district court then dismissed, without prejudice, the state-law claims, Counts VI, VII, and VIII.

Appellants timely noted an appeal on January 12, 2007, and we possess jurisdiction pursuant to 28 U.S.C.A. § 1291 (West 2006).


II.

On appeal, Appellants contend that the district court erred in dismissing Counts I, II, IV, and V and in granting Appellees qualified immunity on Count III. We address each of these arguments in turn.

12

A. Standard of Review

The district court dismissed the complaint for failure to state a claim under Rule 12(b)(6). We review the district court's decision de novo. Bominflot, Inc. v. The M/V Henrich S, 465 F.3d 144, 145 (4th Cir. 2006). "[A] Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999). Additionally, a complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007) (emphasis added). As the Twombly Court explained, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 1964-65. Accordingly, in that case, the Court upheld the dismissal of a complaint where the plaintiffs failed to "nudge[] their claims across the line from conceivable to plausible." Id. at 1974.

B. Fourteenth Amendment Substantive Due Process Claim

Appellants first argue on appeal that the Appellees violated their substantive due process rights by depriving them of their

13

constitutionally protected rights in the continued ownership and operation of RNR, its Virginia ABC license, and its conditional-use permit.

The Fourteenth Amendment's due process clause contains both a procedural and substantive component. To state a claim for violation of substantive due process, a claimant must allege: "(1) that they had property or a property interest; (2) that the state deprived them of this property or property interest; and (3) that the state's action falls so far beyond the outer limits of legitimate governmental action that no process could cure the deficiency." Sylvia Dev. Corp. v. Calvert County, 48 F.3d 810, 827 (4th Cir. 1995); see also Love v. Pepersack, 47 F.3d 120, 122 (4th Cir. 1995) ("Substantive due process is a far narrower concept than procedural; it is an absolute check on certain governmental actions notwithstanding the fairness of the procedures used to implement them." (internal quotation marks omitted)). The protections of substantive due process "'run only to state action which is so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies.'" Id. (quoting Rucker v. Harford County, 946 F.2d 278, 281 (4th Cir. 1991)). "Irrationality and arbitrariness imply a most stringent

14

standard against which state action is to be measured in assessing a substantive due process claim." Rucker, 946 F.2d at 281.

In the complaint, Appellants allege that they have property interests in: (1) the ownership and operation of RNR; (2) RNR's Virginia ABC license; and (3) RNR's conditional-use permit from Manassas Park City. The complaint further alleges that the named defendants deprived Appellants of these property interests through a vindictive campaign culminating in the fabrication of evidence at hearings regarding RNR's ABC license and conditional-use permit. The district court dismissed this claim, concluding that Appellants had no property interest in the conditional-use permit, and that they had adequate state remedies regarding the removal of the ABC license, i.e., the Appellants could (and did) appeal that deprivation under Va. Code Ann. § 4.1-227 (1999 & Supp. 2007).

Appellants admittedly have a property interest in both the ABC license and the conditional-use permit.[2] The alleged actions here, however, do not fall "so far outside" the realm of normal governmental behavior that there is no "adequate rectification by

_____

[2]The district court found that Ruttenberg did not have a property interest in the conditional-use permit, but subsequent to its ruling, the Circuit Court of Prince William County ruled that Ruttenberg does have a property interest in that permit. Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits," Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972), so we are bound to conclude that Ruttenberg does have a protectable property right in his conditional-use permit.

any post-deprivation state remedies." Sylvia Dev. Corp., 48 F.3d at 827 (internal quotation marks omitted). Indeed, pursuant to Va. Code Ann. § 2.2-4027 (2005 & Supp. 2007), Appellants are entitled to judicial review of the revocation of both the conditional-use permit and his ABC license. The complaint makes no allegation regarding the inadequacy of this judicial review, and Appellants simply argue before us that the remedy is "nothing more than a deferential appellate review by the state court." (Appellant's Br. at 34.) Appellants identify no caselaw, however, holding that judicial review that applies a deferential standard of review does not constitute an adequate post-deprivation remedy.

Moreover, the existence of established state procedures available to RNR before revocation of its ABC license and conditional-use permit "belies the existence of a substantive due process claim" as it relates to Appellants' claimed right to ownership and operation of RNR. Sylvia Dev. Corp., 48 F.3d at 829. At the state administrative hearings, Appellants had the opportunity to challenge the evidence against them--the same challenges they present before us. In their substantive due process claim, Appellants essentially ask us to reweigh the credibility determinations made by the state administrative bodies. We decline to do so, and therefore affirm the dismissal of the substantive due process claim.

C. First Amendment Claim

16

Appellants next contend that the district court erred in dismissing their claim that the Appellees violated their First Amendment rights by retaliating against Ruttenberg for exercising his right to free speech.

"The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). Of course, "not every reaction made in response to an individual's exercise of his First Amendment right to free speech is actionable retaliation." Id. Thus, to prevail on a retaliation claim under 42 U.S.C.A. § 1983 (West 2003), Appellants' allegations must satisfy a three-prong test. "First, [Appellants] must demonstrate that [their] speech was protected." Id. at 686. "Second, [Appellants] must demonstrate that the defendant's alleged retaliatory action adversely affected [their] constitutionally protected speech." Id. Finally, the Appellants "must demonstrate that a causal relationship exists between its speech and the defendant's retaliatory action." Id.

In their complaint, the Appellants allege that Ruttenberg complained about Detective L to his supervisor, Officer Berry, and that Officer Berry cancelled a ride-along that Detective L had scheduled with his girlfriend. Appellants allege that Detective L retaliated by conducting a multi-year vendetta against Ruttenberg,

17

culminating in the June 2, 2004 raid at RNR.  The district court dismissed this claim because Appellants "fail[ed] to allege any adverse impact on their First Amendment rights."  (J.A. at 188.) Although we disagree with the district court's analysis of this issue, we nonetheless affirm.  See Catawba Indian Tribe of S.C. v. City of Rock Hill, 501 F.3d 368, 372 n.4 (4th Cir. 2007) (explaining that because we "review judgments, not opinions," we are "entitled to affirm the district court on any ground that would support the judgment in favor of the party prevailing below").

In reviewing the complaint, we agree with the Appellants that it alleges facts sufficient to establish two of the elements necessary to state a First Amendment retaliation claim.  Clearly Ruttenberg's speech was on a matter of public concern and thus protected.  As to the second requirement, we disagree with the district court's conclusion that Appellants "fail[ed] to allege any adverse impact on their First Amendment rights."  (J.A. at 188.) The test is not whether Appellants' First Amendment rights were chilled, but whether a person of reasonable firmness in Appellants' situation would have been chilled.  "[W]e undertake an objective inquiry into whether a similarly situated person of ordinary firmness reasonably would be chilled by the government conduct in light of the circumstances presented in the particular case." Blankenship v. Manchin, 471 F.3d 523, 530 (4th Cir. 2006) (internal quotation marks omitted).  In so doing, we must "focus on the

18

status of the speaker, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." Id. at 531 (internal quotation marks omitted). Here, given the allegations in the complaint, a reasonable person in Appellants' situation would have been chilled by the alleged retaliatory conduct. As we explained in Blankenship, a chill is likely when the state actor has "'engaged the punitive machinery of the government in order to punish'" an individual for speaking out. Blankenship, 471 F.3d at 531 (quoting Garcia v. City of Trenton, 348 F.3d 726, 729 (8th Cir. 2003)).

We conclude, however, that Appellants have failed to establish a causal relationship between their speech and the retaliatory action. "The causation requirement is rigorous; it is not enough that the protected expression played a role or was a motivating factor in the retaliation." Huang v. Bd. of Governors of the Univ. of N.C., 902 F.2d 1134, 1140 (4th Cir. 1990). Appellants must show that "but for" the protected speech, the alleged retaliatory conduct would not have occurred. Id. Even under a favorable reading of the complaint, it is clear that Detective L's vindictive actions began prior to any complaints raised by Ruttenberg to the detective's superiors. Indeed, the complaint alleges that Ruttenberg knew he was under investigation for cocaine use and distribution before he lodged any complaints to the police. As such, Appellants cannot meet the "rigorous" causation requirement

19

of showing that the alleged retaliatory conduct would not have occurred "but for" his complaints about Detective L. We therefore affirm the dismissal of the First Amendment claim.

### D. Fourteenth Amendment Equal Protection Claim

The Appellants next argue that the district court erred in concluding that they had failed to plead a "class of one" equal protection claim. "The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (internal quotation marks and alteration omitted). In recognition of this guarantee, "the Supreme Court has recognized the validity of 'class of one' Equal Protection claims, 'where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" Willis v. Town of Marshall, 426 F.3d 251, 263 (4th Cir. 2005) (quoting Olech, 528 U.S. at 564).

The complaint alleges that Mayor Jones, Chief Evans, Detective L, and Detective W "selectively enforced the ABC laws and narcotics laws" in violation of Appellants' equal protection rights. (J.A. at 86.) The district court dismissed this claim because the "conclusory allegations" were "plainly insufficient" and "d[id] not

20

allege the existence of any similarly situated persons, nor . . . that [Appellants] were treated differently from any such persons." (J.A. at 193.)

As the district court correctly stated, the complaint fails to allege the existence of similarly situated individuals. In addition, the complaint fails to allege that the disparate treatment lacked a rational basis. See Giarratano v. Johnson, 521 F.3d 298 (4th Cir. 2008) (affirming the dismissal of a complaint that failed to adequately allege the absence of a rational basis supporting the plaintiff's disparate treatment). Thus, it fails to state a claim under Rule 12(b)(6), and we affirm the district court's dismissal of this count.

### E. Section 1983 Conspiracy Claim

We now turn to Appellants' claim that they adequately pleaded a conspiracy claim under § 1983. Section 1983 includes protection against conspiracies to violate civil rights. "To establish a civil conspiracy under § 1983, Appellants must present evidence that the Appellees acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in Appellants' deprivation of a constitutional right." Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996). Appellants alleged in their complaint that the Appellees conspired to violate their substantive due process, equal protection, First Amendment, and Fourth Amendment rights. The district court dismissed this

claim because (1) it dismissed the underlying claims and (2) Appellants "fail[ed] to allege any facts demonstrating an agreement amongst the alleged co-conspirators." (J.A. at 194.)

Although we do not dismiss all of the underlying claims, we believe the district court correctly dismissed this count as well. Under Twombly, Appellants were required to allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 127 S. Ct. at 1974. This requires a "plausible suggestion of conspiracy," Twombly, 127 S. Ct. at 1971, and Appellants needed to plead facts that would "reasonably lead to the inference that Appellees positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan," Hinkle, 81 F.3d at 421. The complaint makes the bare, conclusory allegation that the defendants conspired to violate his constitutional rights and that the conspiracy culminated in the fabricated testimony. No common purpose is alleged and nothing beyond conclusory allegations of conspiracy are made. We therefore affirm the dismissal of the § 1983 conspiracy claim.

F. The Fourth Amendment Claim

Appellants next contend that the district court erred when it dismissed Count III of their complaint on qualified immunity grounds. Count III alleges that the defendants deprived plaintiffs of their Fourth Amendment rights in violation of 42 U.S.C.A. § 1983. Specifically, Appellants assert that ABC agents and local

law enforcement officers conducted an unreasonable search of RNR on June 2, 2004 and, in doing so, contravened Appellants' clearly established constitutional rights. Although the district court expressed doubt about whether a constitutional violation occurred, it did not expressly resolve that issue. Ruttenberg, 464 F. Supp. 2d at 549-50. Instead, the district court held that "assuming, without deciding," there was a constitutional violation, the defendants were nonetheless entitled to qualified immunity. Id. at 550.

We first note that the district court erred in its approach under Saucier v. Katz, 533 U.S. 194 (2001). Before moving to a qualified immunity analysis, the district court should have determined whether or not there was a constitutional violation. This is the clear dictate of Saucier's two-step process. See Saucier, 533 U.S. at 201 (describing the "threshold question" as whether "the facts alleged show the officer's conduct violated a constitutional right"); see also Miller v. Prince George's County, Md., 475 F.3d 621, 626-27 (4th Cir. 2007).

Accordingly, in reviewing the decision to dismiss Count III, we must initially determine, based on the facts alleged, whether there was a constitutional violation in connection with the search of RNR. If there was no violation, we obviously need not inquire into whether qualified immunity was appropriate. See Abney v. Coe, 493 F.3d 412, 415 (4th Cir. 2007). If a constitutional right was

23

violated, however, we must then examine "whether the right was clearly established." Saucier, 533 U.S. at 201.

With respect to the threshold inquiry, Appellants make three claims as to why the search ran afoul of the Fourth Amendment. We discuss each in turn.

1.

Appellants first argue that the administrative search of RNR violated the Fourth Amendment because it was a pretext for a purely criminal investigation.

In September 1993, RNR obtained a license to sell beer on its premises. As a licensee, RNR consented to allowing the Virginia ABC Board and its agents "free access" to "examin[e] and inspect[]" its premises for the purpose of ensuring compliance with ABC regulations. See 3 Va. Admin. Code § 5-50-70(B). It is well-settled that such regulatory inspections do not need to be accompanied by probable cause or a search warrant. See New York v. Burger, 482 U.S. 691, 700-02 (1987) (holding that warrantless, administrative searches of "closely regulated businesses" are permissible under the Fourth Amendment); Colonnade Catering Corp. v. United States, 397 U.S. 72, 77 (1970) (noting that the liquor industry has long been "subject to close supervision and inspection"). This is because licensees like RNR enjoy a "particularly attenuated" expectation of privacy. See Burger, 482 U.S. at 700.

24

Although administrative searches are a recognized exception to the traditional warrant requirement, they cannot be used as a pretext for what is, in reality, a purely criminal investigation. See Burger, 482 at 716 n.27. Otherwise, such inspections could serve as a convenient circumvention of the normal strictures placed on law enforcement officers. Accordingly, our sister circuits have held that an administrative search should be considered a pretext, and thus deemed impermissible, if the inspection was performed "solely to gather evidence of criminal activity." See, e.g., United States v. Johnson, 994 F.2d 740, 742 (10th Cir. 1993); Bruce v. Beary, 498 F.3d 1232, 1239-40 (11th Cir. 2007) (quoting Johnson); see also City of Indianapolis v. Edmond, 531 U.S. 32, 37-38 (2000) (indicating that a warrant is required if "the primary purpose [of the search] was to detect evidence of ordinary criminal wrongdoing").

At the same time, however, a regulatory inspection does not contravene the Fourth Amendment simply "because it is accompanied by some suspicion of wrongdoing." Bruce, 498 F.3d at 1242 (emphasis omitted); United States v. Thomas, 973 F.2d 1152, 1155-56 (5th Cir. 1992); United States v. Nechy, 827 F.2d 1161, 1166-67 (7th Cir. 1987); see also United States v. Villamonte-Marquez, 462 U.S. 579, 584 n.3 (1983). Rather, as the Tenth Circuit recently explained, "an administrative inspection may encompass both an administrative and a criminal law enforcement purpose." United

States v. Johnson, 408 F.3d 1313, 1323 (10th Cir. 2005); see also Bruce, 498 F.3d at 1250-53 (Carnes, J., concurring) (collecting cases). It is only when the search is so divorced from a regulatory purpose that it cannot be considered administrative in nature that the Fourth Amendment is transgressed.

Based on the facts alleged in the complaint, we do not believe the administrative search of RNR was "employed solely as an instrument of criminal law enforcement." Johnson, 994 F.2d at 743. Rather, the record indicates that the search served primarily, if not entirely, a regulatory purpose.

To begin, as Appellants acknowledge in their complaint, local police officers observed ABC violations at RNR prior to the administrative inspection in June 2004. This was clearly permissible under Virginia's ABC laws, which allow "law-enforcement officers . . . free access to any retail licensed establishment for the purpose of observation." See 3 Va. Admin. Code § 5-50-70(C). The officers subsequently contacted ABC Special Agent John Loftis, the ABC official with authority over the territory that included RNR, about conducting an administrative inspection. Special Agent Loftis, as well as five or six additional ABC officials, then joined local law enforcement officers in the search of RNR.

With respect to the search itself, there is no evidence or allegation that law enforcement officers or ABC officials searched for anything other than ABC violations when conducting the

26

administrative inspection.  In fact, Appellants admit that the ABC officers found an ABC violation during their search -- the failure of RNR to mark two bottles of beer as samples –- and confiscated two bottles of vodka as contraband from Ruttenberg's office. Moreover, as Appellants state in their complaint, the Virginia ABC Board brought several administrative charges against RNR after the raid.  These charges eventually led to the ABC revoking RNR's beer license.

Thus, it is undisputed that ABC officials participated in the search, an ABC violation was discovered during the search, administrative charges were brought as a result of the search, and those charges eventually led to the revocation of RNR's beer license.  Moreover, there is no allegation that the search was for anything other than ABC violations.  Consequently, any claim that the inspection was performed "solely to gather evidence of criminal activity," Johnson, 994 F.2d at 742, surely "stops short of the line between possibility and plausibility," Twombly, 127 S. Ct. at 1966.

Amicus curiae counters with the case of Swint v. City of Wadley, Ala., 51 F.3d 988 (11th Cir. 1995).  However, the facts alleged here are clearly distinguishable from those in Swint.  In that case, the Eleventh Circuit found an administrative search to be a pretext in part because "the officers did not simply search for violations of the liquor laws by the establishment; instead, a

27

number of people were searched for evidence of their violation of drug laws, searches to which they did not consent as part of any regulatory scheme." Id. at 999. Unlike the plaintiffs in Swint, Appellants do not allege that the officers conducting the inspection in this case searched for anything other than ABC violations. Instead, they allege that the search was motivated by "personal animus between defendant L and David Ruttenberg." (J.A. at 78.) However, such an assertion -- its speculative nature aside -- is not relevant to our pretext analysis. See Crosby v. Paulk, 187 F.3d 1339, 1344 (11th Cir. 1999) (noting that because "[s]tate officials can act lawfully even when motivated by a dislike or hostility," the court did not need to "address the alleged ill will between" the officers and the plaintiff (internal quotations omitted)); Johnson, 408 F.3d at 1323 ("Where officers are engaged in a proper administrative search, the officers' motive is irrelevant.").

In sum, based on the facts as alleged in the complaint, we believe the search was not pretextual but rather a proper exercise of the state and local governments' legitimate interest in investigating possible ABC violations. We therefore find no constitutional violation with respect to this claim.

2.

Appellants next argue that even if the inspection was lawfully authorized, the officers conducting the search exceeded the scope

28

of their statutory authority.  Specifically, Appellants contend that the officers unlawfully entered and searched David Ruttenberg's private office, thereby violating his Fourth Amendment rights.  Because the office was subject to inspection under the authorizing statute, we find no such violation.

Section 5-50-70(B) of Virginia's Administrative Code states that the ABC "board and its special agents shall be allowed free access during reasonable hours to <u>every</u> <u>place</u> in the Commonwealth where alcoholic beverages are manufactured, bottled, stored, offered for sale or sold, for the purpose of examining and inspecting such place."  3 Va. Admin. Code § 5-50-70(B) (emphasis added).[3]  Virginia's Alcoholic Beverage Control Act defines "place" as "the real estate, together with any buildings or other improvements thereon, designated in the application for a license as the place at which the manufacture, bottling, distribution, use or sale of alcoholic beverages shall be performed, except that portion of any such building or other improvement actually and exclusively used as a private residence."  Va. Code Ann. § 4.1-100 (2007).  Taken together, these provisions cast a wide net.

Despite the authorization's evident breadth, Appellants contend that the search of Ruttenberg's office was not permitted

---

[3]As noted above, § 5-50-70(C) provides that "[i]n addition to special agents, other law-enforcement officers in the performance of their official duties shall be allowed free access to any retail licensed establishment for the purpose of observation of activities on those licensed premises during reasonable hours." 3 Va. Admin. Code § 5-50-70(C) (2007).

under § 5-50-70(B) because alcoholic beverages were not "manufactured, bottled, stored, offered for sale or sold" in the office itself. We reject such a narrow reading of the governing statute.

As noted above, ABC officials may inspect any part of the licensed premises -- that is, "the real estate, together with any buildings or other improvements thereon" -- except those areas "actually and exclusively used as a private residence." <u>See</u> Va. Code Ann. § 4.1-100. The district court found that Ruttenberg's "office is located on the premises of RNR." <u>Ruttenberg</u>, 464 F. Supp. 2d at 549. Furthermore, Appellants do not suggest that the office was utilized as a private residence. Therefore, because the office is part of the RNR premises and does not fall within the statute's lone exception (use as a private residence), we hold that § 5-50-70(B) authorized the ABC officials to search Ruttenberg's office as part of their administrative inspection.

Our holding is buttressed by an additional consideration: if so-called "private offices" located on the premises of liquor establishments were immune from administrative inspection, ABC licensees such as Ruttenberg and RNR could utilize such spaces as sanctuaries for illegal activity. In fact, during the inspection at issue here, ABC officials confiscated two bottles of contraband alcohol that were improperly stored in Ruttenberg's office. If the scope of § 5-50-70(B)'s authorization was as narrowly confined as

30

Appellants wish, ABC infractions would likely multiply in number since they could easily be hidden from an ABC agent's purview. This would plainly run contrary to the broad inspection authority granted to ABC officials under the Virginia statute.

3.

Lastly, Appellants claim that the administrative search of RNR violated the Fourth Amendment because it was unreasonably executed. Specifically, Appellants contend that the number of police officers who participated in the search, as well as the conduct of the officers during the inspection, was unreasonably excessive and, therefore, constitutionally problematic.

As with any Fourth Amendment inquiry, the touchstone here is reasonableness. Indeed, even when a search is lawfully authorized, "the manner in which [the search] is executed is subject to later judicial review as to its reasonableness." Dalia v. United States, 441 U.S. 238, 258 (1979); Bruce, 498 F.3d at 1244 (holding that the "execution of an administrative inspection must be reasonable in order to be constitutional"); see also Duncan v. Barnes, 592 F.2d 1336, 1338 (5th Cir. 1979). Thus, while officers must be afforded significant latitude in how they choose to execute a search, their conduct must likewise "remain[] within the boundaries of reasonableness." Lawmaster v. Ward, 125 F.3d 1341, 1349 (10th Cir. 1997) (citing Dalia, 441 U.S. at 257); Tarpley v. Greene, 684 F.2d 1, 8-9 (D.C. Cir. 1982). When determining whether a search was

31

executed in a reasonable manner, courts must consider the totality of the circumstances. This, of course, is a "highly fact-dependent inquiry." Lawmaster, 125 F.3d at 1349 (citing Tarpley, 684 F.2d at 9).

In their complaint, Appellants allege that over fifty law enforcement officers, including six or seven ABC agents, participated in a search of RNR that lasted more than an hour. According to Appellants, many of the officers were heavily armed SWAT team members dressed in full tactical gear. Appellants also claim that RNR patrons and employees were ordered "against the wall to be searched by heavily armed officers," (J.A. at 85), causing them to be "detained and terrorized," (J.A. at 76). Finally, Appellants allege -- in their briefs, but not their complaint -- that these patrons and employees were held at gunpoint for over an hour.

Based on these allegations, we conclude that Appellants have pleaded sufficient facts to survive a motion to dismiss. At this stage of the proceedings, we simply do not know enough about the circumstances surrounding the search and its execution to determine whether the inspection was reasonably conducted and, if not, whether qualified immunity is appropriate. Accordingly, we reverse the grant of qualified immunity in favor of Detective L, Detective W, Chief Evans, and Kifer on Appellants' Fourth Amendment claim and remand the case for further proceedings.

While we of course leave the conduct of such proceedings to the district court, the boundaries of the inquiry upon remand are worth mention.

As noted above, the inquiry here is one of reasonableness. Thus, the guiding standard "is whether, under the circumstances confronting the officers and disregarding their intent or motivation, their conduct was objectively reasonable." Crosby, 187 F.3d at 1351 (citing Graham v. Connor, 490 U.S. 386, 397 (1989)). Because context matters when making such a determination, per se rules are seldom appropriate.

For example, the number of officers present for the search, while undoubtedly relevant, is not by itself dispositive. Depending on the circumstances, it may be eminently reasonable for fifty (or more) police officers to participate in the search of a liquor establishment. See McNair v. Coffey, 279 F.3d 463, 466 (7th Cir. 2002) (remarking that "nothing in the fourth amendment specifies how many officers may respond to a call"). The number may be gross overkill or it may be necessary to ensure the safety of inspectors and patrons alike. Whatever the case, the number of officers is but one consideration among many, and it certainly does not on its face render the search unreasonable.

Ordering patrons and employees against a wall during the search is likewise not per se unreasonable, as Appellants appear to

suggest. The Supreme Court has repeatedly made clear that officers, when executing a search, "may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search." Los Angeles County, Cal. v. Rettele, 550 U.S. ___, 127 S. Ct. 1989, 1992 (2007) (citing Muehler v. Mena, 544 U.S. 93, 98-100 (2005)). It is for this reason that the Supreme Court has underscored that officers may "detain the occupants of the premises while a proper search is conducted." Michigan v. Summers, 452 U.S. 692, 705 (1981). Such detentions, the Court has noted, are appropriate "because the character of the additional intrusion caused by detention is slight and because the justifications for detention are substantial." Muehler, 544 U.S. at 98 (citing Summers, 452 U.S. at 701-05).

Rather than resort to per se rules, courts must consider all of the relevant circumstances surrounding the search. Thus, in addition to the facts discussed above, the district court should take into account, among other things, the following factors: the nature of the place searched, the number of people the officers expected to encounter, Crosby, 187 F.3d at 1343 n.4, the likelihood that the officers "would be met with resistance or defiance," Bruce, 498 F.3d at 1245, and whether the search was unduly prolonged. The court should also consider the specific conduct of the officers involved, particularly whether they engaged in any

34

unreasonably threatening behavior, such as an abuse of weapons or the causing of physical harm.

At the same time, however, it must be remembered that it is not a court's "role to tell local governments how to conduct an administrative search." Crosby, 187 F.3d at 1348. So long as the officers behaved reasonably, the discretion about how to best perform the inspection is theirs and theirs alone. The very term "reasonableness" implies reasonable latitude and room for judgment. And when officers "act in a reasonable manner to protect themselves from harm . . . the Fourth Amendment is not violated." See Rettele, 127 S. Ct. at 1993-94.

We find three decisions by the Eleventh Circuit to be instructive in determining whether, based on the totality of the circumstances, an administrative search was unreasonably excessive. In the first pair of cases -- Swint and Bruce -- the court found administrative inspections to be "unreasonably excessive in execution" and, therefore, in violation of the Fourth Amendment. Bruce, 498 F.3d at 1244.

In Swint, the court found two searches of a nightclub to be unreasonable based on the following facts: the raids involved 30-40 officers, including eight SWAT team officers; the inspections lasted approximately one and one-half hours; during the search, officers pointed their weapons at club employees and patrons; the police grabbed and shoved one person against a wall and pushed

another patron off a bar stool; threatening comments, such as "Shut up, or I'll shut you up myself," were made by officers to persons detained; and an officer, with his finger on the trigger, pointed a shotgun in someone's face. See Swint, 51 F.3d at 992-93. According to the Eleventh Circuit, such a "massive show of force and excessive intrusion" could not be justified as a reasonable part of the administrative search. Id. at 999.

Similarly, the court in Bruce found the administrative search of an auto body shop to be unreasonably conducted. Bruce, 498 F.3d at 1243-44. The search there involved twenty law enforcement officers and lasted over eight hours. In addition, officers arrived in unmarked vehicles and surrounded the property to block the exits. They entered the premises with "automatic shotguns and sidearms drawn." Notably, one officer stuck a shotgun into an employee's back and continued to point it at him after the employee turned around. Other employees were "lined up along a fence and patted down and deprived of their identification." See id. at 1236, 1244-45. As a result, the court found that the "massive show of force in this case, like that in Swint, is not the sort of conduct that was approved by the Supreme Court in Burger." Id. at 1245 (internal quotation marks omitted).

While Swint and Bruce are examples of unreasonable searches, the case of Crosby v. Paulk, 187 F.3d 1339 (11th Cir. 1999), involves a search that was reasonably executed. In Crosby, forty

36

law enforcement officers searched a pair of adjoining nightclubs for two hours. Notably, the officers "expected to encounter 500 to 700 patrons at the two nightclubs," including many who would be consuming alcohol. Id. at 1343 n.4, 1348. Upon entering, the officers "ordered the patrons to remain where they were, and instructed people on the dance floor to sit on the floor and not to return to their tables." Id. at 1343 n.5. The court found "no evidence that any officer involved in securing the nightclubs and conducting the investigation drew a weapon or threatened the arrestees or any patrons." Id. at 1343. Based on these facts, the court found no "violation of a constitutional right in this context." Id. at 1352 (emphasis omitted).

It should be clear from the foregoing that any decision as to reasonableness rests on the particular circumstances of a case. Although we conclude that Appellants' complaint survives a motion to dismiss, we note that further factual development may show that no constitutional violation occurred.

And if, after further factual development, the district court determines that there was a constitutional violation with respect to the search's execution, it still must perform the second inquiry under Saucier: whether the right violated was clearly established. Saucier, 533 U.S. at 201. Of course, as we made clear in Turner v. Dammon, 848 F.2d 440 (4th Cir. 1988), "[t]here is no question that the Fourth Amendment prohibition of unreasonable searches and

37

seizures applies to the performance of administrative searches of commercial property." Id. at 446. Admittedly, "[t]he burden on law enforcement officials in conforming their conduct to Fourth Amendment standards is not great in the area of traditionally regulated industries," but it is a burden nonetheless. Id. at 447.

However, as the Supreme Court emphasized in Saucier, this does not end the qualified immunity analysis. Rather, the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201 (emphasis added). To be clear, this does not mean that a constitutional right is clearly established only if the facts of a previous case mirror in all respects those of the present case. See Robles v. Prince George's County, 302 F.3d 262, 270 (4th Cir. 2002) ("Although notice does not require that the very action in question has previously been held unlawful, it does mean that in light of pre-existing law the unlawfulness must be apparent." (internal quotation marks omitted)); see also Simeon v. T. Smith & Son, Inc., 852 F.2d 1421, 1453 (5th Cir. 1988) (explaining that courts should not confine a previous case to its facts so that a rule would only apply "to redheaded Walpoles in pale magenta Buick cars") (quoting Karl N. Llewellyn). Instead, the proper question to ask is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202 (citing Wilson v. Layne, 526 U.S. 603, 615 (1999)). This ensures that

government officials performing discretionary functions are shielded from civil liability insofar as their conduct, even if mistaken, "could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987) (citing Malley v. Briggs, 475 U.S. 335, 341 (1986)); Saucier, 533 U.S. at 205. Whether the case may be resolved on summary judgment is, of course, not possible to determine at this time.

5.

In sum, we find that the administrative inspection of RNR was not pretextual and that the search of David Ruttenberg's private office was lawfully authorized by the governing statute. With respect to the search's execution, we reverse the district court's dismissal of Count III on qualified immunity and remand this matter to the district court for further proceedings.

III.

For the foregoing reasons, we affirm the dismissal of Counts I, II, IV, and V of Appellants' complaint and reverse the dismissal of Count III.[4]

---

[4]The district court dismissed without prejudice Appellants' state law claims because no federal claims remained. See Shanaghan v. Cahill, 58 F.3d 106, 109 (4th Cir. 1995) ("The doctrine of supplemental jurisdiction indicates that federal courts generally have discretion to retain or dismiss state law claims when the federal basis for an action drops away.") Because we are remanding the Fourth Amendment claim for further consideration, we also

reverse the district court's dismissal of the state law claims so that it may again consider its supplemental jurisdiction over those claims.